# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

---

MARY BORG and JAMES W. BORG,   )
                             )
     Plaintiffs,          )
                             )
v.                        )   No. 04-2874 Ml/V
                             )
J.P. MORGAN CHASE & CO.,     )
d/b/a CARDMEMBER SERVICES,   )
UNION PLANTERS CORPORATION,  )
d/b/a UNION PLANTERS BANK,   )
N.A., HOME INSTEAD SENIOR CARE, )
INC., and FELICIA JONES DAVIS,  )
                             )
     Defendants.          )

---

### ORDER GRANTING CHASE MANHATTAN BANK USA, N.A.'S MOTION FOR SUMMARY JUDGMENT, UNION PLANTERS BANK N.A.'S MOTION FOR SUMMARY JUDGMENT, AND HOME INSTEAD SENIOR CARE, INC.'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court are the separate motions for summary judgment, each filed on November 15, 2005, by Defendant Chase Manhattan Bank USA, N.A. ("Chase"), Defendant Union Planters Bank N.A.[1] ("Union Planters"), and Defendant Home Instead Senior Care, Inc. ("Home Instead"). Plaintiffs Mary Borg[2] and James W. Borg responded in opposition to each motion separately on December 14,

---

[1] Plaintiffs amended their complaint on February 3, 2005, to reflect that Chase Manhattan Bank USA, N.A. was incorrectly sued as "J.P. Morgan Chase & Co. D/b/a Cardmember Services" and Union Planters Bank N.A. was incorrectly sued as "Union Planters Corporation d/b/a Union Planters Bank N.A."

[2] On June 6, 2006, the Court granted Plaintiff James Borg's motion to substitute James W. Borg, Executor of the Estate of Mary Borg, for Plaintiff Mary Borg, who passed away on March 4, 2006.

2005.  Chase filed a reply brief on January 10, 2006.  Union
Planters filed a reply brief on January 23, 2006.  Home Instead
filed a reply brief on December 27, 2005.  For the reasons set
forth below, each Defendant's motion for summary judgment is
GRANTED.

## I.  Factual Background

### A.  Complaint

This case arises out of an alleged fraud perpetrated by
Plaintiff Mary Borg's in-home caregiver, Defendant Felicia Jones
Davis ("Davis"), wherein Davis fraudulently obtained a credit
card in Mary Borg's name and paid off the charges by forging Mary
Borg's name on checks from Plaintiffs' joint checking account.
Plaintiffs Mary Borg and her son James Borg originally filed suit
in state court on June 24, 2004.  The case was subsequently
removed to this Court on October 29, 2004, and Plaintiffs have
since amended their complaint twice.

Davis worked in Plaintiffs' home from 2000 through sometime
in 2003 in order to assist Mary Borg with her daily tasks and
medication.  Plaintiffs allege that sometime in 2002, Davis
intercepted an unsolicited credit card application sent to
Plaintiffs' residence in Mary Borg's name from Defendant Chase.
Davis allegedly applied for and obtained a Chase credit card in
Mary Borg's name and used it primarily to obtain cash from ATM
cash machines in Memphis, Tennessee, and Mississippi.  (Compl. ¶¶

10-11.)  According to Plaintiffs, Davis forged checks in the total amount of $82,800.00 on Plaintiffs' joint checking account with Defendant Union Planters in order to pay the Chase credit card charges.  Plaintiffs allege that Davis also forged checks to herself and to other businesses in the amount of $2,083.00.

Plaintiffs allege that Chase's negligence in opening and maintaining the credit card account in Mary Borg's name was the proximate cause of the financial harm and damage to Plaintiffs. (Id. at ¶ 15.)  Plaintiffs also allege that the $82,800.00 paid to Chase was "stolen personal property" that Chase "converted . . . to its own use" and has refused to return to Plaintiffs.  (Id. at ¶¶ 37-41.)  Finally, Plaintiffs allege that Chase violated two provisions of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., which prohibits the issuance of credit cards "except in response to a request or application therefor" and limits liability of credit cardholders for unauthorized use of their credit card.  15 U.S.C. §§ 1642, 1643.

Plaintiffs allege that Union Planters "breached its contract to plaintiffs by the wrongful honoring and payment" of forged checks written on Plaintiffs' joint checking account.  (Compl. ¶ 22.)  Plaintiffs also contend that Union Planters, through its agents and employees, was negligent in honoring and paying out the checks that were not signed in the name of the account holder.  (Id. at ¶ 24.)  In their complaint, Plaintiffs note that

-3-

the majority of the checks made payable to Chase were signed "Mary E. Borg," whereas the account holders named on the face of the checks were "Mrs. Charles W. Borg" and "Jim W. Borg."  (Id. at ¶ 13.)

Finally, Plaintiffs' complaint alleges that as Davis's employer, Home Instead is vicariously liable for Davis's alleged theft.  (Id. at ¶ 33.)  Plaintiffs also allege that Home Instead negligently hired and supervised Davis and that these negligent acts were the proximate cause of Plaintiffs' financial loss. Specifically, Plaintiffs alleges that Home Instead negligently: (1) failed to conduct a "proper and complete" background check on Davis; (2) failed to inquire of Mary Borg's family members "if there were any complaints in the performance of the defendant Davis and whether or not someone was periodically monitoring [her] financial transaction[s]; (3) failed to advise plaintiffs of any past thefts or complaints of thefts involving "the elderly and helpless" by former Home Instead employees "so as to alert plaintiffs to the need for extra vigilance"; (4) failed to advise plaintiffs of the need to secure and protect their checkbooks, bank account statements, and other financial documents; (5) failing to periodically supervise its employees on site "to monitor and inquire about the opportunities for theft."  (Id. at ¶¶ 35-36.)

Plaintiffs seek actual damages in the amount of $86,482.63 from Union Planters, Home Instead, and Davis, and $82,800.00 from Chase, all jointly and severally.  Plaintiffs also seek punitive damages from Chase in the amount of $750,000.00, plus attorney's fees and costs.

The Court granted Plaintiffs' motion for a default judgment against Defendant Davis on February 1, 2006.  Defendants Chase, Union Planters, and Home Instead moved separately for summary judgment on November 15, 2005, and their motions are now before the Court.

**B.  Facts**

The facts of this case are largely undisputed.[3]  James Borg, who is now in his sixties, has lived with his mother, Mary Borg, at the same house in Memphis since the early 1980s.  (J. Borg Dep. 7-8.)  In approximately 1989 or 1990, Plaintiffs opened a joint checking account with Union Planters.  (Id. at 17.)  Union Planters mailed copies of the joint checking account statements and cancelled checks to Plaintiffs' residence each month.  (Id. at 80.)  James Borg testified that "Union Planters is pretty punctual about getting their statements out" and that the statements would ordinarily arrive at Plaintiffs' residence

---

[3] Chase, Union Planters, and Home Instead each included a separate statement of facts in connection with their motions for summary judgment.  Plaintiffs did not submit separate statements of fact with their responses and merely disputed Defendant's characterization of the facts or restated the allegations contained in their complaint.

within the first four days of each month.  (Id. at 100.)  James
Borg also testified that he did not review the joint checking
account statements.  According to James Borg, his mother always
reviewed the statements as well as other mail addressed to her
because she would "get mad if [he] tried to get in her business."
(Id. at 20.)

From the mid-1980s until 2001, William McGraw——Mary Borg's
second husband——also lived with Plaintiffs at their Memphis
residence.  (Id. at 8-9.)  In 2000, Milam McGraw Propst, Mr.
McGraw's daughter, hired Home Instead to provide a caregiver to
come to Plaintiffs' house every day for five to eight hours per
day to assist Mary Borg and Mr. McGraw.  Although several
caregivers worked at the residence initially, Davis was
eventually selected as the sole caregiver.  Mr. McGraw passed
away in 2001, but Davis continued to provide in-home assistance
for Mary Borg after Mr. McGraw's death.  (Id. at 21-24, 123.)

In support of its motion for summary judgment, Home Instead
submitted the affidavit of its owner, Darrell Doane.  According
to Doane, Home Instead hired Davis in October 2000.  Home Instead
checked Davis's personal and employment references, which were
all "complimentary."  (Doane Aff. ¶ 2.)  Home Instead also
conducted an abuse registry check and found no complaints.  A
private company performed a criminal history background check on
Davis and found no criminal record.  Home Instead also verified

that Davis was a licensed nurse's aid in Tennessee.  (Doane Aff. ¶¶ 3-4.)

Doane's affidavit states that Home Instead received no complaints about Davis during her time with the company. According to Doane, Home Instead has no knowledge that Davis committed any criminal acts; in fact, it has never been interviewed by any law enforcement officials regarding Davis's alleged fraud and theft.  Doane states that Home Instead had no reason to believe that Davis would or did commit any criminal acts, and therefore, found no need to advise Plaintiffs to secure financial instruments and documents.  Doane further states that "Home Instead does not periodically monitor the financial activities of its residents [because] Home Instead believes the financial activities of its clients are private and not its business."  (Id. at ¶¶ 5-8.)

The undisputed facts also show that in early 2002, Chase mailed a credit card application to Mary Borg at her residence in Memphis.  The application provided a telephone number for the recipient to call to apply for a credit card as well as a code number that the applicant was required to supply for processing purposes.  (Decl. Karen Trimmer, Chase Vice President of Regional Investigations, Oct. 4, 2005, ("Trimmer Decl.") ¶ 2.)  On April 11, 2002, a person purporting to be Mary Borg called the telephone number on the application and supplied the

corresponding code number to open a Chase credit card account.
The application was processed by Future Call, one of Chase's
third-party vendors.  Chase requires Future Card to certify that
the address to which the application was sent is the same as the
address to which the card was mailed, and Chase later verifies
the same information.  (Id. at ¶¶ 3-5.)  Chase also requires
Future Call to have every applicant provide it with the code
contained in the application as well as the correct social
security number and date of birth of the person to whom the
application had been mailed.  Chase maintains that had the
applicant supplied an address different from that of Mary Borg,
to whom the application had been mailed, this discrepancy would
have triggered a fraud alert.  (Id. at ¶¶ 6-7.)

The Chase credit card, issued in the name of Mary Borg,
incurred charges between May 22, 2002, and May 27, 2003.  Each
payment received on the Chase account during this period was in
the form of a check written on Plaintiffs' joint checking account
with Union Planters.  In late May or early June 2003, Plaintiffs
discovered the existence of the credit card, the unauthorized
charges, and the forged checks on Plaintiffs' joint checking
account.  (J. Borg Dep. 100.)[4]  Plaintiffs subsequently notified

---

[4] In his deposition, James Borg testified that he discovered the
fraud and reported it to Union Planters in June 2003.  In their
response to Union Planters' motion for summary judgment, Plaintiffs
argue that, based on Union Planters' own representative's testimony,
the bank received notice of the forged checks in mid-May 2003.  (Pls.'
Resp. Union Planters' Mot. Summ. J. 7)(citing Dep. Brian Grissom 66-

Union Planters and Chase of the fraudulent activity. (Trimmer Decl. ¶¶ 9-11; 14-15; J. Borg Dep. 100.)

On June 16, 2003, Mary Borg submitted an Affidavit of Forgery to Union Planters. The affidavit lists thirty-five forged checks——the first dated April 18, 2002 (check number 4535), and the last dated May 18, 2003 (check number 9909). (Union Planters' Mot. Summ. J. Ex. G.) The joint checking account statement dated May 2, 2002, included a copy of the check Plaintiffs identify as the first forged check (number 4535, dated April 18, 2002). (Id. Ex. F.)

On June 23, 2003, Mary Borg executed a fraud alert affidavit for Chase in which she states that on "5/27/2003, I reported the unauthorized usage, loss/theft of my credit/debit card and/or I was notified by Chase regarding unauthorized transactions on my account." (Id. at ¶ 16; Ex. D.) The affidavit lists over 150 unauthorized transactions through May 27, 2003. (Id.) After Chase was notified of the fraudulent activity, it closed the account and did not seek any payment from Plaintiffs to cover the outstanding balance of $2,127.58. Chase also contacted the relevant credit bureaus to "ensure that Mrs. Borg did not have any negative credit reports as a result of Ms. Davis's fraud." (Id. at ¶¶ 14-15, 18.)

_____

67.)

-9-

## II.  Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989).  In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir. 1998).  A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving

party] is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 251-52.

## III.  Analysis

### A.  Chase

Chase moves for summary judgment on all of Plaintiffs' claims.  Specifically, Chase argues that (1) Plaintiffs' claims under the Truth in Lending Act are barred by the Act's one-year statute of limitations; (2) Plaintiffs have failed to create a genuine issue of material fact on their negligence claim; and (3) Plaintiffs' cause of action for conversion under the common law is precluded by Tennessee's Uniform Commercial Code, under which an issuer of a check may not bring a claim for its conversion. The Court will address each argument in turn.

#### i.  Truth in Lending Act

Chase argues that Plaintiffs' claims under the Truth in Lending Act, 15 U.S.C. § 1601 <u>et seq.</u> ("TILA"), are time-barred. The Act provides that "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e).  The

Sixth Circuit has held that "the statute of limitations for actions brought under 15 U.S.C. § 1640(e) is subject to equitable tolling in appropriate circumstances, and that for application of the doctrine of fraudulent concealment, the limitations period runs from the date on which the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation."   Jones v. TransOhio Sav. Ass'n, 747 F.2d 1037, 1043 (6th Cir. 1984).

Chase argues that even if the statute of limitations is tolled until the date on which Plaintiffs discovered or had reasonable opportunity to discover the fraudulently obtained credit card, the claims are nevertheless untimely, as Plaintiffs' complaint was filed more than one year after they discovered the fraud.  The declaration of Karen Trimmer, Chase's Vice President of Regional Investigations, states that "[i]n late May and early June of 2003, Plaintiffs alerted Chase to a check and credit card scheme perpetrated by Felicia Jones Davis," and that "[a]fter being alerted of the potential fraud, Chase immediately closed the account."  (Trimmer Decl. ¶¶ 14-15.)  Chase's internal account documents indicate that Plaintiffs first alerted Chase to the fraud on May 27, 2003.  (Decl. Karen Trimmer, Ex. A, at CH000326.)  Plaintiffs did not file their complaint until June 24, 2004, more than one year after they discovered the fraud.

Plaintiffs do not dispute that they contacted Chase in May

-12-

2003 to put Chase on notice of the unauthorized use of a credit card in Mary Borg's name.  Plaintiffs argue, instead, that the one-year statute of limitations should be tolled until July 2003 because they "could not have had knowledge of the extent of the fraud and the violation of the Act" until they received the final credit card statement in July 2003.  Plaintiffs' argument is unpersuasive.  As the case law makes clear, the limitations period runs from "the date on which the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation" and <u>not</u> from the date on which the full extent of the fraud is known.  <u>See</u> <u>Jones</u>, 747 F.2d at 1043.  Similarly, Plaintiffs' argument that the statute of limitations should be tolled until they made a demand for a refund from Chase on January 15, 2004, and February 4, 2004, must fail, as their demands took place many months after they discovered or reasonably should have discovered the basis for their TILA claims.

Plaintiffs also argue that a separate violation of 15 U.S.C. § 1642 occurred "sometime in May or June 2003" when Chase opened a new credit card account in Mary Borg's name.  According to Chase, this "new" account was merely an internal administrative account that Chase opened when it closed the other account as part of standard protocol in fraud cases designed to prevent additional transactions while the alleged fraud is being

-13-

investigated.  (Trimmer Dep. 47-49.)  Further, Chase contends
that the second account was not intended to be a functioning
account and that no transactions were ever completed in this
account.  (Chase Reply 12.)  Regardless of the circumstances
surrounding the later account, however, Plaintiffs may not state
a new cause of action in their response to a motion for summary
judgment.  This claim was not raised in Plaintiffs' original or
amended complaints, and the Court will not consider it now.
Accordingly, Chase's motion to dismiss Plaintiffs' TILA claims is
GRANTED, as these claims are barred by the one-year statute of
limitations set forth in 15 U.S.C. 1640(e).

### ii. Negligence

Chase next moves for summary judgment on Plaintiffs' common
law claim that Chase was negligent in issuing a credit card in
Mary Borg's name and negligently monitored the account for
fraudulent activity.  Under Tennessee law, the plaintiff in a
negligence action must prove each of the following elements: (1)
a duty of care owed by the defendant to the plaintiff; (2)
conduct of the defendant that fell below the applicable standard
of care, amounting to a breach of the duty owed to the plaintiff;
(3) an injury or loss sustained by the plaintiff; (4) causation
in fact; and (5) proximate causation.  Burroughs v. Magee, 118
S.W.3d 323, 327-28 (Tenn. 2003).  Chase argues that Plaintiffs
have failed to create an issue of material fact as to whether

Chase's conduct fell below the required standard of care in the credit card industry.

Plaintiffs' complaint alleges that Chase was negligent in four ways: (1) failing to alert Mary Borg that it was sending an unsolicited credit card application; (2) failing to determine Mary Borg's age, health, or living arrangements, whether she regularly receives her correspondence, is capable of handling her own financial affairs, desires a credit card, or "is ambulatory"; (3) failing to monitor the "account of its patrons to determine if any unusual patterns of conduct exist"; and (4) accepting checks that do not bear the proper signature of the maker. (Compl. ¶ 15.)  Plaintiffs have produced no evidence that by failing to perform these acts, Chase's conduct fell below the required standard of care in the credit card industry.  In their response to Chase's motion for summary judgment, however, Plaintiffs attach the affidavit of Don Coker, an expert in the banking and credit card industries, who states that in his opinion, "the conduct of Chase in the solicitation of the Borg account, the verification of the signature, the monitoring of the account or lack thereof falls well below the standard of commercial reasonableness in the credit card industry in the United States." (unnumbered attachment to Pls.' Resp. Chase's Mot. Summ. J., Aff. Don Coker, Dec. 9, 2005, 3.)

Plaintiffs acknowledge that the disclosure of this expert is

untimely, but assert that they were only recently able to afford
to retain an expert, and they "pray the indulgence of the Court
to be permitted to produce this expert proof."  Chase, on the
other hand, vigorously objects in its reply brief to Plaintiffs'
untimely expert disclosure, as the deadline for such disclosure
passed on June 15, 2005, and urges the Court to "reject this
attempt to blindside Chase at this late stage in the litigation."
(Chase Reply 4.)

The Court will not permit Plaintiffs to rely on expert
testimony only disclosed six months after the expert disclosure
deadline passed in an effort to defeat summary judgment.  See
Fed. R. Civ. P. 37(c)("A party that without substantial
justification fails to disclose information required by Rule
26(a) or 26(e)(1) . . . is not, unless such failure is harmless,
permitted to use as evidence at a trial, at a hearing, or on a
motion any witness or information not so disclosed.")  Chase has
not had an opportunity to depose this expert, and therefore,
would be prejudiced by the late disclosure of his statements
submitted in opposition to its motion for summary judgment.
Accordingly, the Court will not consider the opinion of Mr. Coker
as to whether Chase's conduct fell below industry standards.  As
Plaintiffs have not come forward with any other evidence to
create a triable issue of material fact on whether Chase breached
its duty of care to Plaintiffs, the Court GRANTS Chase's motion

for summary judgment on this cause of action.

### iii.  Conversion

Finally, Chase moves to dismiss Plaintiffs' claim for common law conversion.  Chase relies on section 47-3-420 of Tennessee's Uniform Commercial Code ("UCC"), which provides that "an action for conversion of an instrument may not be brought by . . . the issuer . . . of the instrument . . . ."  Tenn. Code Ann. § 47-3-420(a).  The comment to this section explains that "[t]here is no reason why a drawer should have an action in conversion.  The check represents an obligation of the drawer rather than property of the drawer."  An "issuer" is a maker or drawer of an instrument.  Tenn. Code Ann. § 47-3-105(c).  A "drawer" is a person who signs or is identified in a draft as a person ordering payment.  § 47-3-103(a)(3).  A "maker" is a person who signs or is identified in a note as a person undertaking to pay.  § 47-3-103(a)(4).

Although Tennessee courts have not addressed this argument, other courts have construed section 3-420 of the UCC as barring an issuer's claim for conversion against a payee even when the issuer's signature was forged or unauthorized.  See Mid-Continent Specialists, Inc. v. Capital Homes, L.C., 106 P.3d 483, 487 (Kan. 2005)("The language of the statute is clear; as an 'issuer of the instrument,' Mid-Continent has no cause of action for its conversion" under section 3-420(a)" where Mid-Continent's

-17-

employee wrote unauthorized company checks to pay personal debts); Grand Rapids Auto Sales, Inc. v. MBNA Am. Bank, 227 F. Supp. 2d 721, 730 (W.D. Mich. 2002)(granting summary judgment in favor of credit card company where plaintiff's employee wrote checks, without authority, on plaintiff's corporate account payable to credit card company for employee's husband's credit card debt); Simmons v. Lennon, 773 A.2d 1064, 1072 (Md. Ct. Spec. App. 2001)(holding that under section 3-420(a), "a drawer whose signature is forged cannot successfully bring an action against a payee . . . for conversion"). A plaintiff cannot avoid the rule of section 3-420 "by arguing that its claim is for conversion of the proceeds of the checks rather than the checks themselves." Grand Rapids Auto Sales, Inc., 227 F. Supp. 2d at 730. As the court in Grand Rapids explained, "[t]his argument must be rejected because the UCC does not draw a distinction between checks and the proceeds received from the checks." Id.

The only authority to which Plaintiffs point in support of their claim is Stockton v. Gristedes Supermarkets, Inc., 177 A.D.2d 425 (N.Y. App. Div. 1991). Stockton held that "[b]y accepting and cashing decedent's stolen and forged checks, and then obtaining payment from decedent's drawee bank[,] defendant converted decedent's stolen checks." The court in Stockton did not cite to any provision of the UCC, however, and the case is factually distinguishable in that the defendant's store manager

-18-

was complicit in the forged check scheme.  <u>See</u> 177 A.D.2d at 426.

Plaintiffs also argue that because Mary Borg's signature was forged, she is not an "issuer" and, therefore, section 47-3-420(a) does not operate to bar Plaintiffs' action for conversion. As set forth above, an "issuer" is defined as a "drawer," or a "person who signs or is identified in a draft as a person ordering payment."  Tenn. Code Ann. §§ 47-3-105(c); 47-3-103(a)(3).  As Mary Borg was identified on the check as the person ordering payment, she is the drawer under the meaning of Tennessee's UCC, whether or not she authorized the checks to be drawn.

In light of the foregoing authority and the plain language of Tenn. Code Ann. § 47-3-420(a), the Court finds that this section bars Plaintiffs' claim for conversion.  Chase's motion for summary judgment as to this cause of action is GRANTED.

**B.  Union Planters**

Union Planters moves for summary judgment on both of Plaintiffs' claims against it——breach of contract and negligence——on the ground that the claims are barred by section 47-4-406 of Tennessee's Uniform Commercial Code.

### i.  One-year Notice Prerequisite

Union Planters first argues that Plaintiffs' claims for any check forged in or before May 2002 are barred by the one-year notice prerequisite set forth in Tenn. Code Ann. § 47-4-406(f)

-19-

because Plaintiffs did not inform Union Planters of the fraud until June 2003.  The one-year requirement is part of the Tennessee UCC's provision entitled "[c]ustomer's duty to review statements of account."  Tenn. Code Ann. § 47-4-406. Specifically, subsection (c) of § 47-4-406 provides that a customer must "exercise reasonable promptness" in examining their bank account statements to determine whether "any payment was not authorized because of an alteration of an item or an unauthorized signature purportedly made by or on behalf of the customer . . . ."  "If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment or missing or incorrectly credited deposit, the customer must promptly notify the bank of the relevant facts."  Tenn. Code Ann. § 47-4-406(c).

The Code provides that a customer who does not discover and report an unauthorized payment within one year after the statement or items are made available to the customer "is precluded from asserting against the bank any claim with respect thereto."  Tenn. Code Ann. § 47-4-406(f).  "The one-year period of limitation acts as a statutory prerequisite of notice, not as a statute of limitations within which a suit must be filed." Harber v. Leader Fed. Bank for Savings, 159 S.W.3d 545, 550 (Tenn. Ct. App. 2004).  The provision "is [thus] not a limitation statute subject to tolling under compelling circumstances but is

a statutory prerequisite of notice that absolutely bars a customer's right to make a claim against the bank after one year without regard to the care or lack of care of either the customer or the bank." Siecinski v. First State Nat'l Bank of East Detroit, 531 N.W.2d 768, 770 (Mich. App. 1995)(construing limitations provision of UCC § 4-406)); see also Nat'l Title Ins. Corp. Agency v. First Union Nat'l Bank, 559 S.E.2d 668, 361 (Va. 2002)(explaining that the "condition precedent does not limit a customer's claim against a bank but requires that the customer first perform the duty to discovery and report any unauthorized signature or alteration on an item before bringing suit against the bank").

Union Planters argues that this one-year notice prerequisite bars Plaintiffs' recovery on any check forged more than one year before Plaintiffs notified Union Planters of the fraud in June 2003. Plaintiffs identify a check dated April 18, 2002, as the first check on which Davis forged Mary Borg's signature. This check was included in the joint checking account statement dated May 2, 2002. (J. Borg Dep., Exs. 1, 6.) Plaintiffs concede that Union Planters mailed statements for Plaintiffs' joint checking account to the Borg residence at the beginning of each month and that they did not discover and report any of the forged checks until mid-May or June 2003.[5] Therefore, because Plaintiffs

_____

[5] Plaintiffs argue that while the statements and copies of cancelled checks may have been mailed to the Borg residence, they "were intercepted by the wrongdoer[,] making it impossible for the

-21-

failed to "discover and report" the unauthorized signatures on the checks included in the May 2, 2002, joint checking account statement within one year, their claims as to these initial forgeries are barred by the one-year notice prerequisite set forth in section 47-4-406(f).

### ii. Statutory Preclusion

Union Planters also argues that Plaintiffs' claims are barred by Tenn. Code Ann. § 47-4-406(d) because Plaintiffs failed to inform Union Planters of the unauthorized signature on the first forged check within thirty days of receiving the May 2002 statement evidencing the first forged check.  Tenn. Code Ann. § 47-4-406(d) provides that:

> If the bank proves that the customer failed, with respect to an item or deposit, to comply with the duties imposed on the customer by subsection (c), the customer is precluded from asserting against the bank:

_____

forgetful and confused Mary Borg to examine them," and, therefore, "plaintiffs did not receive them as alleged."  (Pls.' Resp. Union Planters' Mot. Summ. J. 3.)  This argument cannot avoid the one-year notice requirement of § 47-4-406(f).  Tenn. Code Ann. § 47-4-406 requires that a bank "send or make available to a customer" the statements of his or her account.  To "send" means "to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed[.]"  Tenn. Code Ann. § 47-1-201(39); see also Vending Chattanooga, Inc. v. Am. Nat'l Bank & Trust Co., 730 S.W.2d 624, 626 (Tenn. 1987)("The bank 'sends' the bank statement to the customer when the statement is deposited in the mail with postage and properly addressed to customer.")  Plaintiffs do not dispute that Union Planters regularly mailed their joint checking account statements to their residence within the first few days of each month during all relevant periods, and therefore, the fact that someone may have intercepted the statements at the mailbox is no defense.

(1)  Such payment or missing or incorrectly
credited deposit, if the bank also proves that it
suffered a loss by reason of the failure; and

(2)  the customer's unauthorized signature or
alteration by the same wrongdoer on any other item
paid in good faith by the bank if the payment was
made before the bank received notice from the
customer of the unauthorized signature or
alteration and after the customer had been afforded
a reasonable time period, not exceeding thirty (30)
days, in which to examine the item or statement of
account and notify the bank.

Tenn. Code Ann. § 47-4-406(d).  Subsection (e) provides that

"[i]f the customer proves that the bank did not pay the item in

good faith, the preclusion under subsection (d) does not apply."

Tenn. Code Ann. § 47-4-406(e).

Tennessee courts recognize that subsection (d) constitutes

an "exception to the general rule" that the bank must bear the

loss when monies have been paid out due to a third party forging

a customer's signature on a check.  <u>Vending Chattanooga, Inc. v.

Am. Nat'l Bank & Trust Co.</u>, 730 S.W.2d 624, 625-26 (Tenn. 1987).

As the Tennessee Supreme Court has explained, if all checks on

which a plaintiff seeks to recover involved "an unauthorized

signature or alteration of the same wrongdoer," as in this case,

and the "customer is found not to have exercised reasonable care

in examining the bank statements, the bank would not be liable

for forgeries paid after the first forged check and statement was

available to the customer for a reasonable period not exceeding

[thirty] days before the bank receives notification from the

customer of the forgery." Id. at 626 (discussing earlier version
of statute that provided for fourteen-day review period).  A
customer "must be held chargeable with knowledge of all the facts
that a reasonable and prudent examination of the returned bank
statements would have disclosed had it been made by a person on
the depositor's behalf who had not participated in the
forgeries." Id. at 627 (quoting J. White and R. Summers, UNIFORM
COMMERCIAL CODE, § 16-7, at 630 (2d Ed. 1980)).

Union Planters argues that because Plaintiffs failed to
report the first forged check within thirty days after the May 2,
2002, statement was made available to them as required under
section 47-4-406(c), they may not recover on any subsequent
checks forged by the same wrongdoer pursuant to section 47-4-
406(d).  Plaintiffs do not dispute that they failed to exercise
reasonable care in examining their bank statements.  Plaintiffs
contend, instead, that Union Planters did not exercise good faith
in paying out the forged checks as required under section 47-4-
406(e), and therefore, the preclusion under subsection (d) does
not apply.  In order to support this argument, Plaintiffs state
that they "are now prepared to offer expert proof as to the
deviation from the standard of care in Banking Industry as it
relates to the conduct, policy and procedure of [Union Planters],
but do not feel that this is the proper time." (Pls.' Resp.
Union Planters' Mot. Summ. J. 10.)  Unfortunately for Plaintiffs,

the proper time to put forward evidence of Union Planters' lack of good faith was in response to the instant motion for summary judgment.  See Vending Chattanooga, Inc., 730 S.W.2d at 628 ("The burden of proof is placed on the customer to establish the negligence of the bank.")  Since Plaintiffs have not done so, they have failed to create a genuine issue of material fact as to whether Union Planters paid the checks in good faith under section 47-4-406(e).  Therefore, Plaintiffs cannot avoid the preclusive effect of section 47-4-406(d).  Union Planters' motion for summary judgment as to all of Plaintiffs' claims is GRANTED.[6]

### C.  Home Instead

Home Instead moves for summary judgment as to Plaintiffs' claims of vicarious liability, negligent hiring, and negligent supervision under Tennessee law.  The Court will address each argument in turn.

### i.  Vicarious Liability

Plaintiffs allege that, as Davis's employer, Home Instead is liable for her tortious conduct.  Under Tennessee law, an employer is vicariously liable for torts committed by its employees that are committed within the course and scope of their employment.  Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins.

---

[6] Union Planters also argues that Plaintiffs' claims are barred by the terms of the Depositor Agreement on their joint checking account.  The Court does not reach this argument since it finds that Union Planters is entitled to summary judgment under Tenn. Code Ann. § 47-4-406(d) and § 47-4-406(f).

Co., 840 S.W.2d 933, 937–38 (Tenn. App. 1992).  For an employer
to be found vicariously liable, a plaintiff bears the burden of
proving that: (1) the person who caused the injury was an
employee; (2) the employee was on the employer's business; and
(3) the employee was acting within the scope of her employment
when the injury occurred.  Id.  Home Instead argues that it is
not vicariously liable for Davis's alleged forgery and theft
because Davis was not acting within the scope of her employment
when she committed these acts.

Conduct of an employee is within the scope of her employment
if: (1) it is of the kind she is employed to perform; (2) it
occurs substantially within the authorized time and space limit;
and (3) it is actuated, at least in part, by a purpose to serve
the master.  Id. at 938 (citing RESTATEMENT (SECOND) OF AGENCY § 228
(1957)).  "Conduct of a servant is not within the scope of
employment if it is different in kind from that authorized, far
beyond the authorized time and space limits, or too little
actuated by a purpose to serve the master."  Id.  Whether an
employee is acting within the scope of her employment is a
question of law "when the facts are undisputed and cannot support
conflicting conclusions."  Id. at 937.

In this case, Plaintiffs have failed even to allege, much
less put forward any evidence, that Davis's alleged wrongs were
actuated by a purpose to serve Home Instead.  The undisputed

facts reveal that Home Instead did not authorize, know about, or profit from Davis's allegedly criminal acts.  Plaintiffs argue that because Davis engaged in this tortious conduct during the work day and while she was performing her general duties of assisting Mary Borg, she was acting within the scope of her employment.  This does not satisfy the requirements for conduct to fall within the scope of employment under Tennessee law.  Accordingly, the Court GRANTS Home Instead's motion for summary judgment on Plaintiffs' vicarious liability claim.

### ii.  Negligent Hiring

Home Instead next moves for summary judgment on Plaintiffs' claim that Home Instead negligently hired Davis because it failed to conduct a "complete and proper" background investigation on Davis.  Home Instead argues that summary judgment is proper because Plaintiffs have failed to establish a genuine issue of material fact as to any element of this cause of action.

In Gates v. McQuiddy Office Prods., 1995 WL 650128 (Tenn. Ct. App. Nov. 2, 1995), the Tennessee Court of Appeals delineated the three elements that a plaintiff must prove in order to recover under a theory of negligent hiring: (1) evidence of unfitness for the particular job; (2) evidence that the applicant for employment, if hired, would pose an unreasonable risk to others; and (3) evidence that the prospective employer knew or should have known that the historical criminality of the

applicant would likely be repetitive.  1995 WL 650128, at *2.
"[N]egligent hiring arises only when a particular unfitness of a
job applicant creates a danger of harm to third persons which the
employer should have known . . . ."  Id.

In this case, the undisputed facts show that Home Instead
investigated Davis's criminal history, conducted professional and
personal reference checks, and performed an abuse registry search
at the time it hired Davis.  (Doane Aff.¶ 2.)  As Darrell Doane,
Home Instead's owner, stated in his affidavit submitted in
connection with Home Instead's motion for summary judgment, the
company found nothing in Davis's background to indicate that she
had received complaints about her past job performance or had a
past criminal record.  In addition, Davis was certified as a
nurse's aid in Tennessee, which, according to Doane, meant that
the State of Tennessee had acquired documents from Mississippi
that "confirmed that Ms. Davis had no documented findings of
abuse, neglect or misappropriation of a resident's property on
file with the Mississippi Nurse Aid Registry."  (Id. at ¶3.)

Plaintiffs argue that Home Instead's background check was
"shoddy, inadequate and negligent" because Home Instead conducted
criminal background checks in Memphis and Shelby County,
Tennessee, but not in Mississippi, where Davis had lived for
several years.  (Pls.' Resp. Home Instead's Mot. Summ. J. 2.)
However, Plaintiffs have not put forward any evidence to show

that had Home Instead checked Davis's criminal background in
Mississippi, it would have uncovered information that would have
put it on notice that Davis might commit theft or fraud in the
future.  Plaintiffs' argument is therefore insufficient to create
a genuine issue of material fact on any element of their
negligent hiring claim.  See Long v. Brookside Manor, 885 S.W.2d
70, 73 (Tenn. Ct. App. 1994)(finding that although nursing home
failed to check with all of employee's former employers before
hiring her, nursing home was not liable for negligent hiring
because there was no evidence in record that a more thorough
investigation would have informed nursing home that employee
might or would abuse patients).

     Plaintiffs next claim that there is a genuine issue of fact
as to whether Home Instead conducted personal and professional
reference checks on Davis because Doane did not personally
discuss the results of such checks with the Home Instead employee
who conducted them and because Home Instead "has produced no
documentary evidence, either from Davis' personnel file or firm
records, to substantiate that Davis had no complaints in
Tennessee and Mississippi . . . ."  (Pls.' Resp. Home Instead's
Mot. Summ. J. 2.)  To defeat a motion for summary judgment,
however, Plaintiffs must set forth specific facts to show that
there is a genuine issue for trial; merely demanding that the
moving party come forward with additional evidence is

insufficient.  Moreover, Plaintiffs have failed to show that there is a causal connection between any purported deficiencies in Home Instead's background and reference checks and the damage Plaintiffs suffered.  <u>Long</u>, 885 S.W.2d at 74 ("[I]t does not follow that liability attaches unless it is shown that there is a causal connection between [the nursing home's] negligence in violating the rule [that requires background checks for nurse-employees] and the injuries of plaintiff and that [the nursing home's] negligence was the proximate cause of plaintiff's injuries.")

The Court thus finds that Home Instead has satisfied its burden of demonstrating that no genuine issue of material fact exists on Plaintiffs' negligent hiring claim and there is no evidence on which a jury could reasonable find for Plaintiffs under this theory.  Accordingly, Home Instead's motion for summary judgment on Plaintiffs' negligent hiring claim is GRANTED.

### iii.  Negligent Supervision

Finally, Home Instead moves for summary judgment on Plaintiffs' claim of negligent supervision.  "The usual context for a claim of negligent supervision by an employer of its employees . . . is where the wrongful conduct of an employee injures an outside third party."  <u>Hays v. Patton-Tully Transp. Co.</u>, 844 F. Supp. 1221, 1222 (W.D. Tenn. 1993).  Although

-30-

Tennessee courts have not specifically defined the elements of negligent supervision, it is settled that a plaintiff "must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the [defendant's] power more probably than not would have prevented the injury."  Phipps v. Walker, 1996 WL 155258 (Tenn. Ct. App. Apr. 4, 1996)(quoting Tedder v. Raskin, 728 S.W.2d 343, 348-49 (Tenn. Ct. App. 1987)).

Home Instead maintains that it had no reason to suspect that Davis was committing tortious or criminal acts while working as a caregiver in the Borg home.  During the period that Davis worked with Mary Borg, Home Instead received only a "glowing" letter from Milam McGraw Propst, Mary Borg's deceased husband's daughter who had originally hired Davis, praising Davis's job performance. The only complaint that Home Instead had about Davis was received on April 5, 2004, after Davis had left Home Instead's employment. (Doane Aff. ¶ 5.)

Plaintiffs argue that Home Instead "should have seen signs or evidence that should have alerted it to the thefts by Davis" but do not explain what those signs might have been.  Plaintiffs also argue that Home Instead's policy of only visiting its clients' home upon the family's request is unsatisfactory. Again, however, Plaintiffs do not explain how an on-site visit to the Borg's residence would have detected or prevented Davis's

conduct.  Nor do Plaintiffs address how Home Instead's policy of
not monitoring its clients' financial affairs was in breach of a
duty owed to Plaintiffs.  In sum, Plaintiffs point to no evidence
or authority to show that Davis's actions were foreseeable or
that there was a causal connection between Home Instead's
purported failure to more closely monitor either Davis's actions
or Plaintiffs' finances and Davis's allegedly criminal acts.  The
Court GRANTS Home Instead's motion for summary judgment as to
Plaintiffs' negligent supervision claim.

**IV.  Conclusion**

For the reasons set forth above, the Court GRANTS the
motions for summary judgment of Defendants Chase, Union Planters,
and Home Instead in their entirety.

So ORDERED this 21st day of July, 2006.

    /s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

-32-